Kelly BOLEY, Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,
Respondent.

No. 05–420V.

United States Court of Federal Claims.

June 11, 2008.

June 26, 2008.[1]

Ronald C. Homer, with whom was Thao Ho, Conway, Homer & Chin–Caplan, P.C., Boston, Massachusetts, for Petitioner.

Katherine C. Esposito, with whom were Jeffrey S. Bucholtz, Acting Assistant Attorney General, Timothy P. Garren, Director, Vincent J. Matanoski, Acting Deputy Director, and Gabrielle M. Fielding, Assistant Director, Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

*OPINION AND ORDER*

WHEELER, Judge.

This case is before the Court for review of the Special Master's decision dismissing Kelly Boley's petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa–1 *et seq.* (the "Vaccine Act"). *Boley v. Sec'y of HHS,* 2007 WL 4589766 (Fed.Cl.Spec.Mstr. Dec. 17, 2007). Ms. Boley claims that a hepatitis B vaccine caused her to suffer neurological injuries and emotional distress. The Special Master found that Ms. Boley's injuries did not persist for six months, as required by 42 U.S.C. § 300aa–11(c)(1)(D)(i). Petitioner filed a timely motion for review on January 16, 2008, alleging that the Special Master's findings were arbitrary, capricious, and an abuse of discretion. Respondent opposed Petitioner's motion on February 15, 2008. The Court deemed oral argument unnecessary.

For the reasons explained below, the Court vacates the Special Master's decision, finding a lack of fundamental fairness in the procedures that were followed. Regrettably, the record reveals that the Special Master was openly hostile toward Petitioner and her counsel. The Special Master monopolized at least 90 percent of the examination of witnesses during the hearing. She first agreed that Petitioner could file a post-hearing brief within 30 days from receipt of the transcript (Nov. 14, 2007 Hearing, Tr. at 69), but then issued her decision one business day after the transcript became available, preempting any chance for Petitioner or Respondent to file a post-hearing brief. The availability of post-hearing briefs would have been helpful

1. Pursuant to Rule 18(b) of the Court's Vaccine Rules, this opinion and order was initially filed under seal. As required under the Rules, each party was afforded 14 days from the date of issue, until June 25, 2008, to object to the public disclosure of any information furnished by that party. Neither party submitted any proposed redactions.

to the Special Master. While the Court expresses no view on whether Ms. Boley may be entitled to compensation, it is apparent that the Special Master did not consider all of the evidence in an ample documentary record. Rather, the Special Master seized upon an expert's testimony that Ms. Boley's injuries may have lasted only for three or four months, and on that basis, dismissed her claim. *Id.* at 39–40. The expert in question first diagnosed Ms. Boley in May 2006, nearly four years after the vaccination, and could not have known other than through record review how long Ms. Boley's injuries existed. Other evidence closer in time to the vaccination suggests that Ms. Boley's injuries persisted well beyond six months.

The procedures followed by the Special Master were in violation of Vaccine Rules 3(b) and 8(c). Rule 3(b) requires the Special Master, in establishing appropriate proceedings, to afford each party "a full and fair opportunity to present its case." Rule 8(c) requires the Special Master, in considering all relevant and reliable evidence, to be "governed by principles of fundamental fairness to both parties." The Court remands this case to the Special Master with instructions to conduct further proceedings in accordance with this decision. At a minimum, the Special Master should permit Petitioner an opportunity to present evidence in a hearing without undue interruption, and should afford the parties the chance to submit posthearing briefs, as initially agreed. The Special Master should prepare a decision that reasonably analyzes all of the relevant evidence of record, not just a single excerpt of testimony. Pursuant to the Vaccine Act, the remand proceedings shall be completed within 90 days from the date of this decision. 42 U.S.C. § 300aa–12(e)(2); Vaccine Rule 28.

*Factual Background* [2]

The Court's decision on Petitioner's motion for review is based principally on the procedures followed by the Special Master. The facts below do not constitute a complete analysis of the medical evidence, but are provided as a summary of the events giving rise to Petitioner's claim.

Kelly Boley was born on June 11, 1973. Petitioner's Exhibit ("Pet. Exh.") 14 at 5. In April 2002, Ms. Boley resided near Denver, Colorado with her husband and three children. *Id.* at 26. She had been accepted into a dental hygiene school. Pet. Exh. 15 at 1. The school required Ms. Boley to receive the hepatitis B vaccine series. *Id.* Ms. Boley previously had received two hepatitis B vaccinations in 1993 with no adverse effects. *Id.* at 2.

Prior to 2002, Ms. Boley had not experienced any serious health problems or limitations. Pet. Exh. 1; Pet. Exh. 15 at 7. She rarely visited doctors' offices except for annual obstetric and gynecological check-ups. Pet. Exh. 14 at 18. Her medical records reveal a few episodes of dizzy spells, lightheadedness, and panic attacks during pregnancy in May and December 2000. Pet. Exh. 1 at 3; Pet. Exh. 3 at 97, 191, 194–95. In March 2002, Ms. Boley again experienced dizziness and lethargy. She began taking medication for dizziness. Pet. Exh. 14 at 218.

On May 13, 2002, Ms. Boley received her first hepatitis B vaccine without incident. Pet. Exh. 5 at 70, 87. On June 12, 2002, she received her second hepatitis B vaccine at the office of her primary care physician, Dr. Philip Rosenblum. Pet. Exh. 5 at 88; Pet. Exh. 15 at 3. Within one day after the second vaccination, Ms. Boley began experiencing extreme fatigue and malaise. Her condition worsened over the next few days. Pet. Exh. 15 at 3–4. Ms. Boley visited Dr. Rosenblum on June 19, 2002, and again on June 24, 2002, complaining of these symptoms. Pet. Exh. 5 at 13, 86. On June 21, 2002, she visited the Emergency Department of the HealthOne North Suburban Medical Center in Thornton, Colorado, complaining of headache, dizziness, lethargy, and nausea. Pet. Exh. 9 at 9–10. The medical records for these visits indicate a possible adverse reaction to the hepatitis B vaccine. Pet. Exh. 5 at 86; Pet. Exh. 9 at 4. Ms. Boley did not receive the

**2.** The background facts are taken from the Special Master's December 17, 2007 decision and Petitioner's motion for review. The Court independently has examined the record and confirmed these facts.

third hepatitis B vaccination of the series. Pet. Exh. 12 at 20.

For four days of the two weeks following her vaccination, Ms. Boley experienced such intense fatigue and dizziness that she could barely get out of bed. Pet. Exh. 15 at 5. Although Ms. Boley gradually began to improve, she continued to feel fatigued and dizzy, and experienced pain behind her eyes, causing headaches and blurred vision. *Id.* at 6. Ms. Boley next saw Dr. Rosenblum on July 29, 2002, when he noted that her dizzy spells and extreme fatigue had all "come on since the second Hep[atitis] B shot." Pet. Exh. 5 at 85. On August 12, 2002, Dr. Rosenblum prescribed medication for dizziness and vertigo, but questioned whether Ms. Boley's symptoms could be associated instead with her anxiety about starting dental hygiene school. *Id.* at 84.

Dr. Rosenblum recommended that Ms. Boley visit Dr. Dennis V. Barcz, an ear, nose, and throat doctor, which she did on August 16, 2002. Pet. Exh. 5 at 61. She also visited a neurologist, Dr. Hua Judy Chen, on October 30, 2002, and again on November 26, 2002, complaining of dizziness, episodic shaking, and numbness. *Id.* at 58–60. Dr. Chen noted that Ms. Boley had "[u]nexplained neurological symptoms likely related to after viral or viral immunization." *Id.* at 58. Ms. Boley saw Dr. Chen again on December 16, 2002, complaining of dizziness. *Id.* at 57.

Ms. Boley visited another neurologist, Dr. Jill Breen, on January 6, 2003, and related to her that since the June 12, 2002 hepatitis B vaccine she continued to experience grogginess, fatigue, muscle twitches, lightheadedness, sensitivity to light, pain when focusing her eyes, and a dull ache behind her eyes. Pet. Exh. 5 at 53–56. Although her symptoms varied from day to day, Dr. Breen reported that "overall there has been no

significant improvement since six months ago." Pet. Exh. 5 at 53.

On March 15, 2003, Dr. Michael Volz, a specialist in allergies and immunology, evaluated Ms. Boley. Pet. Exh. 12 at 19–21. Dr. Volz reported that "[t]he onset of episodic symptoms within 24 hours after the [hepatitis B] vaccinations could be coincidental but would make one suspicious of some cause/effect possibly stimulating an enhanced hypersensitive immunologic reaction that may wax and wane and is stimulated by other factors nonspecifically since then." *Id.* at 21.

Ms. Boley began receiving treatment from Dr. Andrew Campbell on May 24, 2003. Pet. Exh. 14 at 24–36. Dr. Campbell was with the Medical Center for Immune and Toxic Disorders in Spring, Texas. *Id.* at 5. In completing her medical history questionnaire for Dr. Campbell, Ms. Boley stated that she began having anxiety issues in August 2002 but that the medicines her doctor had given her made her feel worse. *Id.* at 36. Ms. Boley noted that her doctors have linked her symptoms to anxiety, but she was "99% sure" her symptoms were linked to the hepatitis B shot, since she had not felt like herself since the shot and "had no health problems" prior to the vaccination. She further stated that "I've been to 7 doctors seeking help and *no one* can give me an answer and all but one said it was not the shot." *Id.* (emphasis in original). Dr. Campbell treated Ms. Boley for approximately 34 months. *See generally* Pet. Exh. 14.[3]

Ms. Boley continued to experience periodic fatigue, dizziness, weakness, vision problems, and occasional headaches behind her eyes from the end of 2003 through 2006. On May 22, 2006, Dr. Richard Hughes, Chief of Neurology at the Denver Health Medical Center, examined Ms. Boley for the first time. Pet. Exh. 21 at 1. By November 13, 2006, after reviewing Ms. Boley's extensive medical rec-

---

3. On June 6, 2007, the Texas Medical Board suspended Dr. Campbell's medical license until February 8, 2008 for unprofessional and dishonorable conduct. Dec. 17, 2007 Dec. at 29–30. The Board concluded that Dr. Campbell failed to practice medicine in an acceptable professional manner consistent with public health and welfare, prescribed nontherapeutic drugs or treatment, and unnecessarily and unreasonably used intravenous immunoglobulin ("IVIG") therapy in four patients without adequate clinical examinations and electro-diagnostic testing to determine if the patients had neuropathy or polyneuropathy. *Id.* at 30–31. After the Special Master's decision, however, a Texas District Court enjoined the Board's suspension of Dr. Campbell's license, based on Dr. Campbell having demonstrated a "likelihood that he may prevail on the trial of this case." Pet. Exh. 26 at 4.

ords, Dr. Hughes concluded that Ms. Boley had experienced a "significant reaction to the hepatitis B vaccine because of the temporal relationship . . ." which lasted "about a year or two." Pet. Exh. 23 at 17. Dr. Hughes described the factors supporting an immunological reaction, such as Ms. Boley's general weakness, slow nerve conduction at times, and higher than expected levels of a variety of antibodies, which drastically improved with Dr. Campbell's IVIG treatment. *Id.* However, Dr. Hughes noted that the exact nature of Ms. Boley's reaction to the hepatitis B vaccine was "not well understood, nor [would] there ever be absolute certainty about it." *Id.*

*Proceedings Before The Special Master*

Ms. Boley filed her Vaccine Act petition in this Court on March 30, 2005. She amended her petition on June 6, 2005, alleging that she suffered "a demyelinating poly neuropathy and sequelae" as a result of the June 12, 2002 hepatitis B vaccination. Amended Compl. at 1. After Ms. Boley filed her medical records and two affidavits, Respondent submitted its Rule 4(c) report on March 9, 2006, concluding that "compensation is not appropriate in this case." Resp.'s Report at 9. Respondent asserted that Ms. Boley's doctors at times ascribed her fatigue and dizziness "to a variety of causes, from anxiety disorder to vestibular labyrinthitis." *Id.* Respondent noted that Ms. Boley had not yet filed a supporting expert report. *Id.*

On September 5, 2006, the Special Master issued a 21–page Order to Show Cause. Without citing any evidence, the Special Master stated that "Petitioner does not have a neurological condition and has no objective illness other than mitral prolapse. Her dizziness, lightheadedness, and headaches occurred two years before she received her 2002 hepatitis B vaccination." Sept. 5, 2006 Order at 1–2. The Special Master ordered Petitioner to show cause by October 13, 2006 why this case should not be dismissed. *Id.* at 2. The Special Master then provided a detailed summary of her review of Ms. Boley's medical records, some of which included evidence of dizziness in 2000 when Ms. Boley

had been pregnant. *Id.* at 2–3. Without benefit of argument or explanation from counsel, the Special Master stated that she had "a number of problems with this case." *Id.* at 18. The Special Master warned that the Petitioner "must file an expert report by October 13, 2006 or this case will be dismissed." *Id.* at 21.

Petitioner's counsel filed a motion for reconsideration on January 4, 2007, noting that the medical records of Dr. Hughes had been filed on December 4, 2006, after issuance of the Show Cause Order. In light of Dr. Hughes's belief that Ms. Boley had suffered a significant reaction to the hepatitis B vaccine, Petitioner urged that Respondent should file an expert report identifying an alternate cause of injury, or concede that Ms. Boley was entitled to compensation. Jan. 4, 2007 Motion at 2, 7. Without affording Respondent an opportunity to respond to Petitioner's request, the Special Master denied the motion for reconsideration on January 8, 2007, and ordered Ms. Boley to file an expert report by February 9, 2007 or the case would be dismissed. Viewing the case as resting on the medical opinion of Dr. Campbell, the Special Master observed that:

> Dr. Campbell is totally devoid of medical professionalism. His opinion that petitioner has an immune-mediated disorder and CIDP[4] due to hepatitis B vaccine is worthless. His test results on petitioner are similarly worthless.

Jan. 8, 2007 Order at 3. After agreed extensions, Petitioner filed the expert report of Dr. Hughes on March 29, 2007. Respondent filed the expert report of Dr. Martin Bielawski on May 25, 2007.

The Special Master scheduled a telephonic hearing for November 14, 2007. At a November 1, 2007 pre-hearing status conference, although unrecorded, Petitioner asserts the Special Master stated that Ms. Boley was "crazy," and could not prove she had a neurological injury. According to Petitioner, the Special Master further stated that the record provided no support for Ms. Boley's petition other than the findings of Dr. Campbell.

---

4. "CIDP" is an acronym for chronic inflammatory demyelinating polyneuropathy, a disease characterized by muscle weakness, weakness in the arms or legs, and loss of reflexes.

The Special Master stated her view that it would be unreasonable for Ms. Boley to proceed to hearing, and threatened Petitioner's counsel that she would not approve fees and expenses for the hearing. Respondent has not disputed that the Special Master made these statements. *See* Resp.'s Opposition, Feb. 15, 2008.

On November 2, 2007, one day after the pre-hearing status conference, the Special Master issued another order, requiring Dr. Hughes to file, prior to the November 14, 2007 hearing, a comprehensive response to Dr. Bielawski's expert report. This order directed Dr. Hughes to address issues that the Special Master regarded as weaknesses in Ms. Boley's claim. Among the questions were: (1) Is Dr. Hughes aware that Dr. Campbell's license to practice medicine in Texas has been suspended because of unprofessional conduct? (2) Is Dr. Hughes aware that Ms. Boley was complaining of headaches, dizziness, and lightheadedness two years before she received the hepatitis B vaccine? (3) Does Dr. Hughes believe that Ms. Boley ever had CIDP? Nov. 2, 2007 Order at 1–2.

In response to this order, Petitioner's counsel advised that, due to the short notice before trial and the busy clinical practice of Dr. Hughes as Chief of Neurology at Denver Health Medical Center, Ms. Boley would be unable to comply. Pet.'s Response to Nov. 2, 2007 Order, at 2. Petitioner's counsel assured that Dr. Hughes would be prepared to answer all questions under oath at the hearing. *Id.*

On November 14, 2007 the Special Master conducted the telephonic hearing in this case. Only the expert witnesses appeared, with Dr. Hughes testifying for Petitioner and Dr. Bielawski testifying for Respondent. The hearing lasted for approximately 90 minutes and is recorded in a 70–page transcript. After only a few moments of preliminary testimony from Dr. Hughes, the Special Master interrupted and began cross-examining Dr. Hughes for the duration of his testimony. At one point, Petitioner's counsel broke in and stated:

> MS. HO: Special Master Millman, if you would let me get through. I know that Dr.

Bielawski has rounds in a couple of hours. If you'll let me get through my direct?

> THE COURT: All right. Just a couple of questions. Then you can go back to him.

Nov. 14, 2007 Hearing, Tr. at 18. Rather than allowing Petitioner's counsel to conduct direct examination, the Special Master continued with cross-examination of Dr. Hughes for another seven transcript pages before Petitioner's counsel could ask a question. *Id.* at 18–25. Then, after only two questions from counsel, the Special Master interrupted again with more cross-examination. In 51 pages of Dr. Hughes's testimony, the Special Master controlled at least 90 percent of the examination. At one point, after Dr. Hughes testified on the length of Ms. Boley's injuries, the following exchange occurred:

> THE COURT: Ms. Ho is not happy with your testimony. She wants you to change it. That's all I've gotten from the last couple questions. Ms. Ho, unless you want to get a different witness to say that your client had a vaccine reaction lasting probably more than six months, you're free to do that.

> MS. HO: Special Master Millman, you're not listening. You didn't even listen to what he was trying to say.

*Id.* at 44. Dr. Hughes later clarified his testimony on the length of Ms. Boley's vaccine-related injuries:

> THE WITNESS: Okay. All right. I'll try again. I think that it was probable that she had a reaction that lasted for the first three, maybe four months and thereafter, deciding when it is almost certainly, let's say when she certainly was normal, when I saw her in May of 2006. And I believe she was normal in the middle of let's say summer of '03. I believe it is probable that she was normal then. And other than that, it's very hard to say. There's no consistent markers that make me feel that one can credibly make a better estimation than that.

*Id.* at 46.

At the conclusion of the testimony, Petitioner's counsel requested permission to file a post-hearing brief. *Id.* at 66. The Special Master asked why a post-hearing brief was

necessary, since Dr. Hughes had testified that Petitioner's vaccine reaction lasted no more than four months, short of the statutory requirement of six months. *Id.* at 66–67. When Petitioner's counsel disputed the Special Master's characterization of Dr. Hughes's testimony, the Special Master agreed to allow the filing of a post-hearing brief within 30 days after receipt of the transcript. *Id.* at 66–67, 69. Respondent reserved the right to file an objection regarding the necessity for post-hearing briefs, on the issue of whether the case was still properly before the Court. *Id.* at 69. Following the hearing, the Special Master issued an order to the same effect. The order stated:

A telephonic hearing was held on November 14, 2007. Petitioner shall have thirty days to read the transcript when it is filed and determine whether to file a post-hearing brief. If respondent's counsel so chooses, she may file an objection to petitioner's intended filing of a post-hearing brief thirty days after the transcript is filed. Respondent's objection is based on petitioner's failure to make a prima facie case since Dr. Richard Hughes testified that petitioner's vaccine injury probably lasted only three to four months. The Vaccine Act requires petitioner's vaccine injury to last more than six months.

Nov. 14, 2007 Order.

The Court's Office of Special Masters received the hearing transcript on Friday, December 14, 2007. The Special Master issued her decision dismissing Ms. Boley's petition on Monday, December 17, 2007, thus preempting the filing of any post-hearing briefs.

### The Special Master's Decision

The statement of facts in the Special Master's decision is virtually a repetition of the medical records review that she included in the September 5, 2006 Show Cause Order. The decision also contains a six-page description of the Texas Medical Board proceedings involving the suspension of Dr. Campbell's medical license. Dr. Hughes, however, did not tie his findings to the diagnosis of Dr. Campbell. Nov. 14, 2007 Hearing, Tr. at 31–32. The Special Master analyzed the testimony of Dr. Hughes, and ultimately dismissed Ms. Boley's petition. The Special Master based the decision on Dr. Hughes's statement that Ms. Boley's vaccine reaction lasted only three or four months.

The decision includes gratuitous attacks on Ms. Boley and her counsel. For example, the Special Master questioned the veracity of Ms. Boley's medical history provided to her doctors:

To every doctor that petitioner saw after she received her 2002 hepatitis B vaccinations, she gave a history that her symptoms of lightheadedness, dizziness, and weakness started right after the second vaccination and that, before the vaccinations, she was healthy. This history is untrue.

Dec. at 43. With regard to counsel, the Special Master stated "petitioner's counsel have failed in their responsibilities as officers of this court." *Id.* at 7. Finding a failure of counsel to have understood Dr. Hughes's position prior to the hearing, the Special Master observed again that "[t]his lack of a reasonable basis will affect the award of attorney's fees and costs to petitioner." *Id.* Elsewhere, the Special Master stated "the undersigned assigns the major blame to Mr. Homer who has vast experience in the Vaccine Program...." *Id.* at 45. On the last page of the decision, the Special Master stated:

The undersigned expressly warned petitioner's counsel Mr. Homer and Ms. Ho during a status conference on November 1, 2007 that the undersigned believed there was no reasonable basis for having a hearing. Mr. Homer insisted on going forward with the hearing.

\* \* \*

The undersigned can only assume petitioner's counsel never asked Dr. Hughes how long petitioner had a probable vaccine reaction, and was unpleasantly surprised when he answered at the hearing that it probably lasted only three or four months.

*Id.* at 46. The Court finds no basis in the record for any of these inordinate remarks toward Ms. Boley or her counsel.

## Discussion

### A. Standard of Review

This Court has jurisdiction under the Vaccine Act to review a Special Master's decision upon the timely request of either party. 42 U.S.C. § 300aa–12(e)(1)–(2). The Special Master's findings of fact receive deferential review under an "arbitrary and capricious" standard, while legal conclusions are reviewed *de novo,* and discretionary rulings are reviewed for an "abuse of discretion." *Munn v. Sec'y of HHS,* 970 F.2d 863, 870 n. 10 (Fed.Cir.1992); *see also Lampe v. Sec'y of HHS,* 219 F.3d 1357, 1360 (Fed.Cir.2000); *Johnson v. Sec'y of HHS,* 33 Fed.Cl. 712, 719–20 (1995), *aff'd,* 99 F.3d 1160 (Fed.Cir. 1996) (table). Thus, when the Court is deciding whether a Special Master's decision should be affirmed or set aside, a different standard must be applied to each aspect of the Special Master's judgment. *See Centmehaiey v. Sec'y of HHS,* 32 Fed.Cl. 612, 619 (1995). On review, this Court is empowered to: (1) uphold the findings of fact and conclusions of law and sustain the decision; (2) set aside any findings of fact and conclusions of law "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ..."; or (3) "remand the petition to the special master for further action in accordance with the court's direction." 42 U.S.C. § 300aa–12(e)(2)(A)–(C); *Althen v. Sec'y of HHS,* 418 F.3d 1274, 1277–78 (Fed.Cir.2005). Combining these standards, this Court "may set aside the decision of a special master only if the special master's fact findings are arbitrary and capricious, its legal conclusions are not in accordance with law, or its discretionary rulings are an abuse of discretion." *Turner v. Sec'y of HHS,* 268 F.3d 1334, 1337 (Fed.Cir.2001) (citing 42 U.S.C. § 300aa–12(e)(2)(B)); *Munn,* 970 F.2d at 870 n. 10.

In the present case, the Court is applying the "abuse of discretion" standard in reviewing the procedures followed by the Special Master.

### B. The Fundamental Fairness Requirement

Under the Vaccine Act, the Special Masters are instructed to conduct proceedings that are expeditious, flexible, and less adversarial, but which also afford each party "a full and fair opportunity" to present its case. Vaccine Rule 3(b); *Adams v. Sec'y of HHS,* 76 Fed.Cl. 23, 24 (2007); *Campbell v. Sec'y of HHS,* 69 Fed.Cl. 775, 777 (2006); *Hovey v. Sec'y of HHS,* 38 Fed.Cl. 397, 400–01 (1997). Additionally, Rule 3(b) requires that a record be created that is sufficient to allow review of the Special Master's decision. *Hovey,* 38 Fed.Cl. at 401 (citing *Dickerson v. Sec'y of HHS,* 35 Fed.Cl. 593, 598 (1996); *Murphy v. Sec'y of HHS,* 23 Cl.Ct. 726, 730 (1991), *aff'd,* 968 F.2d 1226 (Fed.Cir.), *cert. denied,* 506 U.S. 974, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992)).

Similarly, the Vaccine Rules require that, in receiving evidence, the Special Master will consider all relevant and reliable evidence "governed by principles of fundamental fairness to both parties." Vaccine Rule 8(c). While the "fundamental fairness" concept does not embrace the rigors of the Federal Rules of Evidence, it "requires a search for the truth." *Campbell,* 69 Fed.Cl. at 778 (citing *Horner v. Sec'y of HHS,* 35 Fed.Cl. 23, 27 (1996)). Plainly, Vaccine Rules 3(b) and 8(c) together contemplate fundamental due process rights that the Special Masters ought to observe in all proceedings. *Campbell,* 69 Fed.Cl. at 778 n. 3 (citing *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) (stating that a fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."); *Doty v. United States,* 53 F.3d 1244, 1251 (Fed.Cir.1995) ("When procedural violations committed by the agency are egregiously removed from fairness, this constitutes an abuse of the agency's administrative discretion.")). The Court finds that the procedures employed by the Special Master in this case did not satisfy these fundamental due process requirements.

The evidentiary record in this case consists of 28 exhibits, and approximately 1,750 pages of medical records. Ms. Boley received treatment and diagnosis from at least seven physicians after her June 12, 2002 hepatitis B vaccination: Dr. Philip Rosenblum, Dr. Dennis Barcz, Dr. Hua Judy Chen, Dr. Jill Breen, Dr. Michael Volz, Dr. Andrew

Campbell, and Dr. Richard Hughes. At the November 14, 2007 hearing, Dr. Hughes testified as an expert witness on Petitioner's behalf. Dr. Hughes first diagnosed Ms. Boley in May 2006, nearly four years after Ms. Boley received her hepatitis B vaccination in June 2002. The Special Master asked Dr. Hughes at the hearing how long Ms. Boley's injuries had persisted, and he answered that the injuries may have lasted for three or four months, or that they may have lasted much longer. Nov. 14, 2007 Hearing, Tr. at 39–40, 46. The Special Master asked Dr. Hughes to distinguish between the period that the injuries were "probable," as opposed to being "possible." *Id.* at 39. The Special Master observed that "I don't do possible." *Id.*

Other physicians diagnosed Ms. Boley much closer in time to the June 2002 hepatitis B vaccination, and their medical records are in evidence. Yet, the Special Master seized upon Dr. Hughes's testimony that Ms. Boley's injuries lasted only for three or four months, and on that basis, dismissed Ms. Boley's claim. The Special Master conducted little if any analysis of the other medical records to determine whether Dr. Hughes's testimony was correct. Logically, the medical records from 2002 and 2003 would have been more probative than the testimony of the doctor who first saw Ms. Boley in 2006. On remand, the Special Master should analyze and explain what her review of those records reveals.

The filing of post-hearing briefs would have allowed the parties to assist the Special Master in identifying the relevant evidence from the other medical records. With 1,750 pages of medical records, a 70-page transcript, and the diagnosis and treatment from seven doctors, post-hearing briefs would have been useful to the Special Master. To deny the parties the chance to file post-hearing briefs, especially after indicating that briefs could be filed, was an imprudent action. There is much more to this case than the single excerpt from Dr. Hughes's testimony. On remand, the Special Master should afford the parties the opportunity to submit the briefs that were contemplated at the close of the hearing.

The Court also is troubled by the manner in which the Special Master conducted the hearing. Certainly, the Special Master is entitled to ask questions during the hearing, and the Vaccine Rules specifically so provide. *See* Vaccine Rule 8(b). Indeed, insightful questions from the bench often are helpful in the search for relevant factual information. However, it is not appropriate for the Special Master to take over the questioning in a cross-examining style better left to opposing counsel. Here, Petitioner's counsel did not have a fair opportunity to present Dr. Hughes's direct testimony. Apparently, the Special Master began the hearing with a preconceived idea of the weaknesses in Ms. Boley's claim, and only wanted to hear testimony on those issues. The concept of fundamental fairness entitles the parties to present their cases at trial as they see it, not just as the Special Master sees it. On remand, if either party desires, the Special Master should reconvene the hearing and allow the testimony to be presented in a more reasonable fashion. The witnesses may ·include anyone with relevant knowledge or information, not just the two experts who testified previously on November 14, 2007.

The way in which the Special Master viewed this case caused her to make inordinate remarks regarding Ms. Boley's veracity, the credibility of Dr. Campbell's diagnosis, the conduct of Petitioner's counsel, and the availability of attorneys' fees and costs. These remarks added little to the substance of the case, and served merely to detract from the decorum of the proceedings. In particular, the Court does not see how the Special Master could have evaluated Petitioner's veracity when she did not testify at the hearing. Presumably, the Special Master has never met Petitioner. On remand, the Special Master should endeavor to determine the merits of Petitioner's claim, and refrain from remarks that might be offensive to the participants.

As noted earlier, by vacating and remanding the case, the Court expresses no view on whether Ms. Boley is entitled to recover. Further proceedings in full compliance with the Court's Vaccine Rules and this opinion will yield the proper outcome.

*Conclusion*

Based upon the foregoing, the Court vacates the Special Master's December 17, 2007 decision, and remands this case to the Special Master for further proceedings in accordance with this opinion. Pursuant to Vaccine Rule 18(b), each party is afforded 14 days to object to the public disclosure of any information submitted by that party. After that period, this opinion will be released to the public.

IT IS SO ORDERED.